THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| R. WAYNE KLEIN, as Receiver,<br><br>            Plaintiff,<br><br>v.<br><br>CHRISTOPHER J. TAYLOR, an individual;<br>ENERGIZING CONCEPTS, LLC, a<br>Wyoming limited liability company,<br><br>            Defendants. | **MEMORANDUM DECISION AND ORDER DENYING RECEIVER'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00816-DN-PK<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

This is an ancillary action to *United States v. RaPower-3, LLC et al.*, 2:15-cv-00828-DN-DAO (D. Utah) ("Civil Enforcement Case") which found that RaPower-3, LLC, and individuals and entities aligned with it conducted a fraudulent tax avoidance scheme for the benefit of Neldon Johnson ("Johnson") and his family, and entities they controlled.[1] Following the Civil Enforcement Case,  R. Wayne Klein was appointed as Receiver ("Receiver") of RaPower-3, LLC ("RaPower"), International Automated Systems Inc. ("IAS"), LTB1, LLC ("LTB1"), their subsidiaries and affiliates,[2] referred to as "Receivership Entities," and the assets of Johnson and R. Gregory Shepard ("Shepard").[3]

The Receiver's Complaint in this ancillary case asserts six causes of action against Defendants Christopher Taylor ("Taylor") and Energizing Concepts, LLC ("Energizing

---

[1] *See* Findings of Fact and Conclusions of Law ("FFCL"), ECF no. 467 in Civil Enforcement Case, Case No. 2:15-cv-00828-DN, filed Oct. 4, 2018.

[2] Collectively, unless stated otherwise, RaPower, IAS, LTB1, and all subsidiaries and affiliated entities are referred to herein as "Receivership Entities." The subsidiaries and affiliated entities are: Solco I, LLC ("Solco"); XSun Energy, LLC ("XSun"); Cobblestone Centre, LC ("Cobblestone"); LTB O&M, LLC; U-Check, Inc.; DCL16BLT, Inc.; DCL-16A, Inc.; N.P. Johnson Family Limited Partnership; Solstice Enterprises, Inc.; Black Night Enterprises, Inc.; Starlite Holdings, Inc.; Shepard Energy; and Shepard Global, Inc.

[3] Collectively, RaPower, IAS, LTB1, Shepard, and Johnson are referred to herein as the "Receivership Defendants."

Concepts") (together, "Defendants").[4] The Receiver alleges that the Receivership Entities fraudulently transferred stock shares and money to Defendants, with the intent to hinder, delay, or defraud the creditors of Receivership Defendants, in exchange for participation in the fraud.[5]

The Receiver seeks summary judgment on his first cause of action, arguing the transfers to Defendants are voidable because they were made with actual or constructive fraud.[6] Defendants oppose the Receiver's Motion.[7] Because summary judgment in favor of the Receiver and against Defendants is not appropriate at this time, the Receiver's Motion for Summary Judgment is DENIED.

# TABLE OF CONTENTS

UNDISPUTED MATERIAL FACTS ........................................................................................ 3

    The Receivership Defendants' fraudulent scheme ............................................................... 3

    The Civil Enforcement Case against the Receivership Defendants ..................................... 5

    Christopher Taylor and Energizing Concept's involvement with the Receivership Defendants 7

    Financial condition of certain Receivership Entities ........................................................... 8

DISCUSSION ....................................................................................................................... 9

    Judicial notice of the findings in the Civil Enforcement Case is allowed and those findings may be used in this ancillary proceeding ............................................................................. 10

    The Receiver is not entitled to summary judgment ........................................................... 13

        The Receiver has not identified which payments were made in the course of the solar panel scheme. .......................................................................................................................... 13

        Taylor has raised a dispute of material fact about whether the Receivership Entities received reasonably equivalent value for his work .......................................................................... 19

ORDER ............................................................................................................................... 21

---

[4] Complaint at 8–13, docket no. 2, filed Oct. 24, 2019.

[5] Complaint ¶¶ 39–45 at 8–9; Motion at 2.

[6] Receiver's Motion for Summary Judgment ("Motion") at 12, docket no. 22, filed Nov. 9, 2021.

[7] Defendant Taylor's Response to Motion for Summary Judgment ("Opposition"), docket no. 25, filed Dec. 26, 2021.

## UNDISPUTED MATERIAL FACTS[8]

### The Receivership Defendants' fraudulent scheme

1.      Johnson claimed to have invented solar energy technology, which involves solar lenses placed in arrays on towers.[9]

2.      To make money from this purported technology, Johnson sold a component of the technology: the solar lenses.[10]

3.      Through a multi-level marketing model (using affiliated entity RaPower), lenses were sold to hundreds of investors across the nation.[11]

4.      IAS or RaPower agreed to build solar towers and install the customers' lenses at a site determined by IAS or RaPower.[12]

---

[8] Those facts, or portions thereof, identified in the parties' briefing that do not appear in these Undisputed Material Facts are either disputed; not supported by cited evidence; not material; or are not facts, but rather, are characterization of facts or legal argument. Additionally, self-serving and conclusory assertions within an affidavit or declaration are not accepted for purposes raising a genuine dispute of a material fact. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). Unless otherwise noted, any citations in the statement of undisputed material facts to the record in the Civil Enforcement Case use "ECF no." while citations to "docket no." refer to the record filed in this action.

[9] *See* Pl. Ex. 579, Deposition Designations for Neldon Johnson, vol. 1, ("Johnson Dep., vol. 1") 134:19-135:2 (June 28, 2017), ECF no. 252-20, filed Nov. 17, 2017; Pl. Ex. 509 at video clip 12_4_38-5_15 ("Pl. Ex. 509"), ECF no. 256-3, filed Nov. 17, 2017; Johnson Dep., vol. 1, 87:16-91:1; Pl. Ex. 509 at video clip 12_4_00-4-23; Johnson Dep., vol. 1, 139:23-144:19.

[10] *See* Pl. Ex. 682, Deposition Designations for RaPower-3, LLC ("RaPower-3 Dep.") 36:4-39:8 (June 30, 2017), ECF no. 252-32, filed Nov. 17, 2017.

[11] RaPower-3 Dep. 32:16-33:14, 36:4-39:8; Pl. Ex. 581, Deposition Designations for International Automated Systems, Inc., ("IAS Dep."), 23:22–25:22 (June 29, 2017), ECF no. 252-21, filed Nov. 17, 2017; Pl. Ex. 8A at 9, ECF No. 254-3, filed Nov. 17, 2017; Pl. Ex. 669, ECF no. 246, filed Nov. 2, 2017; Pl. Ex. 742A, ECF no. 331-1, filed under seal Mar. 9, 2018; Pl. Ex. 742B, ECF No. 331-2, filed under seal Mar. 9, 2018; Pl. Ex. 749; Gov. Ex. BK0001, T. 858:12-863:16.

[12] Pl. Ex. 462, ECF no. 255-29, filed Nov. 17, 2017; Pl. Ex. 673, Deposition Designations for LTB1, LLC, ("LTB1 Dep.") 43:16-46:24 (July 1, 2017), ECF no. 252-28, filed Nov. 17, 2017; Pl. Ex. 464 at 2, ECF no. 255-31, filed Nov. 17, 2017; Ex. 94¶ 3, ECF no. 254-26, filed Nov. 17, 2017; Pl. Ex. 511 at 1, ECF no. 252-16, filed Nov. 17, 2017; Pl. Ex. 685, Deposition Designations for R. Gregory Shepard ("Shepard Dep."), 157:18-24 (May 22, 2017), ECF no. 256-27, filed Nov. 17, 2017; Pl. Ex. 119 at 1, ECF no. 254-31, filed Nov. 17, 2017.

5.      When customers purchased lenses, the customers also signed an operations and maintenance agreement with LTB1, with LTB1 agreeing to operate and maintain the customers' lenses to produce revenue.[13]

6.      LTB1 was to make quarterly payments to the lens purchasers, representing a portion of the revenues earned from the operation of the solar lenses.[14]

7.      Johnson illustrated his idea as follows:[15]



---

[13] Pl. Ex. 94 at 2, ECF no. 254-26, filed Nov. 17, 2017, Pl. Ex. 121, ECF no. 254-32, filed Nov. 17, 2017; Pl. Ex. 25 at 1, ECF no. 254-9, filed Nov. 17, 2017; Pl. Ex. 557 at 1, ECF no. 256-12, filed Nov. 17, 2017; Pl. Ex. 473, ECF no. 255-37, filed Nov. 17, 2017; Pl. Ex. 533 at 2, ECF no. 256-9, filed Nov. 17, 2017.

[14] Pl. Ex. 121 at 4, ECF no. 254-32, filed Nov. 17.

[15] IAS Dep. 162:1-165:9; Pl. Ex. 532 at 6, ECF no. 252-19, filed Nov. 17, 2017; *see also* Pl. Ex. 531, ECF no. 252-18, filed Nov. 17, 2017; LTB1 Dep. 71:25-74:21, 88:7-17.

8.     The Receivership Defendants advertised substantial returns and tax benefits in exchange for only a down payment on the solar lenses:[16]



**The Civil Enforcement Case against the Receivership Defendants**

9.     On November 23, 2015, the United States filed the Civil Enforcement Case against the Receivership Defendants alleging that they were operating a fraudulent solar energy scheme.[17]

10.     The Receivership Defendants sold solar lenses emphasizing their purported tax benefits. Customers were told that they could "zero out" their federal income tax liability by

---

[16] Plaintiff's Trial Exhibits 496, 497, and 777 in Civil Enforcement Case, docket no. 8-3, filed March 3, 2021.

[17] Complaint for Permanent Injunction and Other Equitable Relief, ECF no. 2, filed Nov. 23, 2015.

buying enough solar lenses and claiming both a depreciation deduction and solar energy tax credit for the lenses.[18]

11.     The purported solar energy technology and solar lenses, however, did not work to generate marketable energy. Specifically, the purported solar energy technology is not now, has never been, and never will be a commercial-grade solar energy system that converts sunlight into electrical power or other useful energy and the solar lenses do not, either on their own or in conjunction with other components, use solar energy to generate marketable electricity.[19]

12.     None of these solar lenses ever met the necessary elements to qualify for depreciation deductions or the solar energy tax credit. Indeed, "[h]undreds, if not thousands" of customer lenses were not even removed from the shipping pallets.[20]

13.     Notwithstanding the fact the solar lenses and technology never worked to generate marketable energy, the Receivership Defendants continued to sell solar lenses to customers emphasizing that customers would qualify for depreciation deductions and/or the solar energy tax credit. Between 45,205 and 49,415 solar lenses were sold to customers.[21]

14.     The Receivership Defendants' own transaction documents and testimony at trial in the Civil Enforcement Case showed that the gross receipts received by the Receivership Defendants were at least $31,312,155 and possibly much more.[22]

---

[18] Johnson Dep., vol. 1, 247:11-248:12; Pl. Ex. 490 at 9-10, ECF no. 255-40, filed Nov. 17, 2017; *see also* IAS Dep. 162:1-165:9; Pl. Ex. 531, ECF no. 256-7, filed Nov. 17, 2017; Pl. Ex. 24 at 1, ECF no. 252-3, filed Nov. 17, 2017; *see also* Pl. Ex. 20 at 2, ECF no. 254-7, filed Nov. 17, 2017; *see* Pl. Ex. 693, Deposition Designations for Frank Lunn, IV ("Lunn Dep.") 188:18-189:20. (Aug. 1, 2016), ECF no. 256-33, filed November 17, 2017.

[19] T. 49:23-50:7, 111:17-112:10.

[20] *See* Shepard Dep. 39:13-42:5, 60:21-61:17; Pl. Ex. 460, ECF no. 255-28, filed Nov. 17, 2017; T. 102:2-21.

[21] Pl. Ex. 742A; Pl. Ex. 742B.

[22] Pl. Ex. 735, ECF no. 370-2, filed April 2, 2018; T. 863:18-868:24; Pl. Ex. 738, ECF no. 370-5, filed April 2, 2018; T. 869:1-25; Pl. Ex. 852 at 59; T. 257:7-258:20, 271:9-272:12, 293:1-294:11, 312:5-15; Pl. Ex. 371; Pl. Ex. 507 at 20, 35, ECF No. 351-15, filed March 26, 2018; T. 1812:4-12.

15.     Based on these facts and others, the court enjoined the Receivership Defendants in the Civil Enforcement Case from promoting their abusive solar energy scheme; ordered them to disgorge their gross receipts; and required them to turn over their assets and business operations to the Receiver.[23]

### Christopher Taylor and Energizing Concept's involvement with the Receivership Defendants

16.     Taylor was a member of the board of directors of the publicly held IAS until 2012.[24]

17.     Taylor was the manager of Receivership Entity LTB1, the entity that supposedly would manage solar lenses purchased by others.[25]

18.     Taylor managed Energizing Concepts, a company formed by Neldon Johnson that was used to raise money by liquidating stock.[26]

19.     Taylor worked as an engineer for IAS.[27]

20.     The Receivership Entities made transfers to Energizing Concepts in exchange for work done by Taylor.[28]

---

[23] Affiliates Order ¶ at 4–5; Memorandum Decision and Order Freezing Assets and to Appoint a Receiver ("Freeze Order"), ECF no. 444 in Civil Enforcement Case, filed Aug. 22, 2018, docket no. 8-6, filed March 3, 2021.

[24] Receiver's Declaration in Support of Motion for Summary Judgment ("Receiver Decl."), docket no. 22-6, filed November 9, 2021, ¶ 4 at 2.

[25] Id. at ¶ 5.

[26] Id. at ¶ 7.

[27] Declaration of Chris Taylor in Opposition to Motion for Summary Judgment ("Taylor Decl."), docket no. 25-1, filed December 26, 2021, ¶ 3 at 1-3.

[28] *Id*., ¶ 6 at 3.

21.     Taylor performed work on other projects for IAS, including a self-scanning retail point of sale [system]," a "self-ordering restaurant system," a "cigarette vending machine," and "DWM (Digital Wave Modulation)[,] a propriety communication protocol . . . ."[29]

22.     Taylor received transfers from Receivership Entities from 2005 to 2012 in the amount of $355,651.89.[30]

23.     Taylor was issued and sold 2,838,137 shares of IAS stock.[31]

24.     Proceeds from sale of that stock totaled $137,148.29.[32]

25.     Energizing Concepts received $12,970 in payments from Receivership Entities.[33]

### Financial condition of certain Receivership Entities

**IAS**

26.     IAS was a public company and filed annual reports that included audited financial statements. The most recent annual report filed by IAS was for 2016. In that report, IAS indicated that it had $0.00 of revenue for the most recent fiscal year.[34]

27.     IAS indicated that as the date of its annual report for 2016, it had "not marketed any commercially acceptable products" and "will continue to need additional operating capital either from borrowing or from the sale of additional equities."[35]

---

[29] *Id*., ¶ 3 at 1-3.

[30] Receiver Decl. ¶ 8 at 2.

[31] *Id.* ¶ 9 at 2.

[32] See *id.* ¶ 10 at 2. Taylor asserts that he did not receive any profit for this stock, but the stock was rather used to finance operations for IAS, including to provide wages for employees. Taylor Decl. ¶¶ 12-14 at 4.

[33] Receiver Decl. ¶ 11 at 2.

[34] IAS Annual Report for Fiscal Year Ended June 30, 2016 at 2, docket no. 8-8, filed March 3, 2021.

[35] *Id*. at 12.

28.     IAS also indicated that "[s]ince inception, we have incurred operating losses each year of our operations and we expect to continue to incur operating losses for the next several years. We may never become profitable."[36]

29.     As of June 30, 2016, IAS indicated that it had accumulated deficits of $40,156,398 with only $3,997,445 in total assets.[37]

30.     IAS's annual report for 2016 also states that "[t]he accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company has suffered recurring losses from operations that raises a substantial doubt about its ability to continue as a going concern."[38]

**RaPower**

31.     RaPower's revenue came from the sale of solar lenses.[39]

32.     Johnson's technology never generated marketable electricity or revenue from the sale of power.[40]

## DISCUSSION

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[41] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue

---

[36] *Id*. at 15.

[37] *Id*. at 21-22.

[38] *Id*. at 37.

[39] Pl. Ex. 8A at 9, ECF No. 254-3, filed Nov. 17, 2017; Pl. Ex. 749; T. 758:10-793:2; Statement of Undisputed Material Facts ¶ 40 at 10.

[40] T. 49:23-50:7, 111:17-112:10; Johnson Dep., vol. 1, 230:4-11. This fact is not disputed by Taylor's assertion that he has seen the technology capture heat and assertion that he had "personally witnessed the solar lenses and technology working." Taylor Decl. ¶ 16-17 at 4.

[41] Fed. R. Civ. P. 56(a).

either way"[42] or "if a reasonable jury could return a verdict for the nonmoving party."[43] A fact is material if "it is essential to the proper disposition of [a] claim."[44] And in ruling on a motion for summary judgment, the factual record and all reasonable inferences drawn therefrom are viewed in a light most favorable to the nonmoving party.[45]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[46] If the moving party carries this initial burden, the nonmoving party "may not rest upon mere allegations or denials of [the] pleading[s], but must set forth *specific facts* showing that there is a *genuine issue* for trial as to those dispositive matters for which it carries the burden of proof."[47] "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient to defeat a properly supported motion for summary judgment."[48]

### Judicial notice of the findings in the Civil Enforcement Case is allowed and those findings may be used in this ancillary proceeding

Defendants challenge the Receiver's use of findings of fact from the Civil Enforcement Case, arguing that they were "not a party to that proceeding and the Receiver is estopped from reliance on the [c]ourt's findings in that case."[49] Defendants are correct that the findings of fact

---

[42] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[43] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (internal quotations omitted).

[44] *Adler*, 144 F.3d at 670.

[45] *Id.*

[46] *Id*. at 670-71.

[47] *Universal Money Ctrs., Inc.*, 22 F.3d at 1529 (internal quotations and citations omitted; emphasis in original).

[48] *Id.* (internal quotations omitted).

[49] Opposition at 5. Taylor does not make any evidentiary objection to the incorporation of the record in the Civil Enforcement Case, but rather only argues that claim preclusion is not appropriate in this case.

in the Civil Enforcement Case are not binding here. However, the record in the Civil

Enforcement Case can be incorporated into this case for two reasons.

First, this action—along with other actions brought by the Receiver— is ancillary to, and

arose directly from, the Civil Enforcement Case.[50] The orders in the Civil Enforcement Case and

their findings with the evidence cited to support them provide the basis for the existence of the

receivership, including findings that Receivership Defendants promoted and operated an abusive

tax scheme centered on purported solar energy technology; that the solar energy technology did

not work; and that the Receivership Defendants' solar scheme was not a legitimate business.

These findings were made against the Receivership Defendants after a 12-day bench trial and

affirmed by the Tenth Circuit Court of Appeals.[51]

In the receivership context, courts often incorporate the factual record of an underlying

case into ancillary actions.[52] The ability of district courts to use such materials is an important

tool in receiverships because use of the existing record reduces the time necessary to settle

disputes, decreases litigation costs, avoids duplication of work, and avoids inconsistent

decisions.[53] The use of the record and undisputed conclusions from the underlying action avoids

the expense, distraction, and complexity of relitigating undisputed—and appeal-affirmed—

findings. District courts have broad discretion in their supervisory role over equity receiverships

involving numerous parties and complex transactions.[54]  Indeed, it seems doubtful at best that

---

[50] General Order No. 19-003, Oct. 18, 2019 (D. Utah).

[51] FFCL at 1; *United States v. RaPower-3, LLC*, 960 F.3d 1240, 1243 (10th Cir. 2020).

[52] *See, e.g., Hafen v. Evans*, No. 2:19-CV-00895-TC, 2021 WL 3501658, at *1 (D. Utah Aug. 9, 2021).

[53] *Elliott,* 953 F.2d at 1566 (citing *SEC v. Wencke,* 783 F.2d 829, 837 (9th Cir. 1986)). These reasons are also why all actions arising from the Civil Enforcement Case were ordered to be heard by the District Judge that presided over the Civil Enforcement Case. General Order, No. 19-003.

[54] *SEC v. Vescor Capital Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010) (district courts have "broad powers and wide discretion to determine relief in an equity receivership."); *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th

equitable receiverships would function if a court was forced to relitigate the factual basis for the receivership every time an ancillary action was litigated; especially when, as here, the defendant does not produce any evidence to challenge the factual record and findings in the underlying action.

Second, judicial notice of the record in the Civil Enforcement Case under Federal Rule of Evidence 201 is also appropriate. In the summary judgment context, federal courts may "take judicial notice, whether requested or not, of its own records and files, and facts which are part of its public records."[55] "Judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it."[56]  Therefore, the record in the Civil Enforcement Case will be construed as part of the record in this case.

To be clear, the findings of fact in the Civil Enforcement Case are not *binding* on Defendants. However, because Defendants present no evidence to challenge the undisputed facts and the record evidence from the Civil Enforcement Case which are incorporated here, there is no need to "grind the same corn a second time."[57] The factual findings in the Civil Enforcement Case that Defendants have failed to challenge with evidence are made again in this case, for the purpose of this Order, as reflected in the Undisputed Material Facts, *supra*.

---

Cir. 2005); *Fed. Trade Comm'n v. Noland*, No. CV-20-00047-PHX-DWL, 2020 WL 4530459, at *7 (D. Ariz. Aug. 6, 2020) (discussing the need to avoid distracting satellite litigation in a receivership).

[55] *St. Louis Baptist Temple v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("a district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they would be utilized at trial."); *Anderson v. Cramlet*, 789 F.2d 840, 845 (10th Cir. 1986); *Van Woudenberg v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001); *United States v. Ahidley*, 486 F.3d 1184, 1192 (10th Cir. 2007).

[56] *St. Louis Baptist Temple*, 605 F.2d at 1172.

[57] See *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 n.33 (5th Cir. 1978) (quoting *Aloe Creme Laboratories v. Francine Co.*, 425 F.2d 1295, 1296 (5th Cir. 1970)).

## The Receiver is not entitled to summary judgment

The Receiver seeks summary judgment on his first fraudulent transfer claim[58] under the Uniform Voidable Transactions Act ("UVTA")[59] against Taylor in the amount of $492,800.18 and against Energizing Concepts in the amount of $12,970.[60] The claims are to recover transfers made by the Receivership Estates which were purportedly made for work done by Taylor.[61] Summary judgment in favor of the Receiver and against Taylor and Energizing Concepts on the Receiver's first cause of action—finding the transfers were made with "actual intent to hinder, delay, or defraud"[62]—is not appropriate at this time because: (1) the Receiver has failed to identify which payments to Taylor and Energizing Concepts were made for work on the solar panel scheme; and (2) the Defendants have raised a genuine dispute of material fact regarding whether they provided reasonably equivalent value for some of the transfers.

**The Receiver has not identified which payments were made in the course of the solar panel scheme.**

Pursuant to the UVTA, a transfer is voidable if the debtor made the transfer with "actual intent to hinder, delay, or defraud *any* creditor of the debtor."[63] To determine if a transfer is made with actual intent to hinder, delay, or defraud, courts will: (1) examine the knowledge of

---

[58] Motion at 12.

[59] The UVTA became effective on May 9, 2017. The governing law prior to the UVTA was the Uniform Fraudulent Transfer Act. The statutes are substantially similar; any differences do not affect the disposition of the Receiver's Motion for Summary Judgment. The statutes are referred to collectively herein as the UVTA, but citations to both statutes are given.

[60] Motion at 3.

[61] Motion at 2; Taylor Decl. ¶ 6 at 3.

[62] Utah Code Ann. § 25-6-202(1)(a); Utah Code Ann. § 25-6-5(1)(a) (2016).

[63] Utah Code Ann. § 25-6-202(1)(a) (emphasis added); Utah Code Ann. § 25-6-5(1)(a) (2016).

the transferors and the purpose of the transfer;[64] and (2) look at a variety of other factors, including the badges of fraud set forth in § 202 of the UVTA.[65]

In these circumstances, the Receivership Entities are the debtors, and the Receivership Estate is the creditor. During the time transfers were made, when the Receivership Entities were "evil zombies" under the control of Johnson, they were acting as debtors. Currently, now that the "spell" has been broken, the Receivership Estate, standing in the shoes of those entities which have been removed from the control of Johnson, is the injured party and serves as a defrauded creditor.[66]

The knowledge of the transferors need not be addressed because the Receiver fails to delineate which asserted badges of fraud should apply to which payments made to Defendants, and Defendants raise a dispute of material fact about whether all payments were made in furtherance of the solar panel scheme. For these reasons, there can be no clear finding of "actual intent to hinder, delay, or defraud" at this stage of the proceedings.

The badges of fraud which the Receiver claims are present in this case are largely tied to the solar panel scheme, and include:

- The Receivership Defendants had been sued or threatened with suit before some of the payments to Taylor, as the Internal Revenue Service executed a criminal search warrant of Receivership Defendants in June 2012.[67]

- The Receivership Defendants were insolvent.[68]

---

[64] *In re Independent Clearing House Co.*, 77 B.R. 843, 860 (D. Utah 1987).

[65] Utah Code Ann. § 25-6-202(2).

[66] *Klein v. Cornelius*, 786 F.3d 1310, 1317 (10th Cir. 2015) (quoting *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir.1995)).

[67] Motion at 15.

[68] Motion at 16.

- The Receivership Defendants have removed or concealed assets and records.[69]

- The Receivership Defendants falsified documents to cover up their fraud.[70]

- The Receivership Entities did not receive reasonably equivalent value in return for the transfers.[71]

- Taylor was an insider of IAS because he served as a director of IAS and was the manager of LTB1, another Receivership Entity.[72]

However, the Receiver has not shown that all payments made to Defendants, or even which payments, were made in furtherance of the solar panel scheme. The payments the Receiver claims are fraudulent took place between 2005 and 2012.[73] Many of the badges of fraud do not clearly apply to the earlier payments, including:

- The Receiver alleges that the Receivership Defendants were not sued or threated with suit until June 2012, close to the very end of the allegedly fraudulent transfers.[74] The Receiver does not explain why the threat of suit in June 2012 should apply to any payments made before that date.

- The Receivership Defendants were insolvent. The Receiver cites to the Findings of Fact in the Civil Enforcement Case and the IAS Annual Report from fiscal year ended June 30, 2016 ("IAS Annual Report")[75] to support his assertion.[76] However, there was no clear finding of insolvency in the Civil Enforcement

---

[69] Motion at 15.

[70] Motion at 16. Falsification of documents is not specifically identified in the statute's non-exhaustive list of badges of fraud.

[71] Motion at 16.

[72] Motion at 16.

[73] Receiver Decl. ¶ 8 at 2.

[74] Motion at 15.

[75] Motion, Exhibit H, IAS Annual Report for fiscal year ended June 30, 2016 ("IAS Annual Report"), docket no. 22-9, filed Nov. 9, 2021.

[76] Motion at 16, n.71.

Case[77] and only one payment to Defendants occurred during the fiscal year ending June 30, 2016.[78] Defendants' failure to adequately dispute the Receiver's assertions of the Receivership Defendants' insolvency[79] does not absolve the Receiver of his burden to show to what payments the badge of insolvency should apply.

Some of the badges of fraud are not clearly applicable to *any* of the payments made to Defendants because they appeared after all payments were made to Defendants, including payments which the Receiver does not claim are fraudulent. The Receivership Defendants made payments to Defendants between 2005 and 2016.[80] Two of the alleged badges of fraud, specifically that the Receivership Defendants (1) removed or concealed assets and records and (2) falsified documents, occurred after entry of the Corrected Receivership Order ("CRO"), which was entered on November 1, 2018.[81] The Receiver does not explain why those badges of fraud should apply to Defendants' payments which preceded entry of the CRO.

Defendants have raised a material issue of fact regarding whether reasonably equivalent value was given in return for the transfers, so that badge of fraud will be addressed below.

This leaves just one badge of fraud asserted by the Receiver; namely, Taylor's status as an insider of two of the Receivership Entities. Taylor asserts he was a Director of IAS from some

---

[77] *See* FFCL.

[78] Complaint, Exhibit A ("Payments Exhibit") at 6, docket no. 2-1, filed Oct. 24, 2019.

[79] Opposition ¶¶ 35–43 at 10–12.

[80] Payments Exhibit.

[81] Civil Enforcement Case, ECF no. 491; *see also* Affiliates Order at 5; Memorandum Decision and Order Granting Turnover Motion; Denying Motion to Strike; Overruling Objection to Authentication of Exhibits; and Overruling Objection to Rejection of Reputed Contract ("Turnover Order") at 41-42, 45-47, ECF no. 1007 in Civil Enforcement Case, filed Sept. 15, 2020, docket no. 8-10, filed March 3, 2021; Civil Contempt Order Re: Neldon Johnson, Glenda Johnson, LaGrand Johnson, and Randale Johnson at 5-9, 11-19, ECF no. 947 in Civil Enforcement Case, filed July 6, 2020, docket no. 8-11, filed March 3, 2021.

point in 2005[82] until April 2012[83] and that he was unaware of his appointment as manager of LTB1 and did not perform any action on its behalf.[84] Payments made directly to Taylor ended in April 2012, so this is the one badge that does seem to apply to every payment made to Taylor individually.[85] It is less clear that this badge applies to payments made to Energizing Concepts, in part because all payments to Energizing Concepts occurred after 2012.[86]

In response to Taylor's new assertion that he gave the proceeds from the sale of his IAS stock back to IAS to pay operating costs for IAS (contrary to his discovery responses), the Receiver raises additional badges of fraud in his Reply:[87]

- The Receivership Defendant IAS retained possession or control of the property transferred after the transfer.[88]

- The transfer or obligation (payments to Taylor) was disclosed or concealed,[89] because "the act of giving the shares to Taylor to sell and provide the proceeds to IAS is a method to conceal the transfers and a scheme to avoid registration of shares and to avoid IAS's (and Johnson's) obligation to report these as share proceeds received by IAS and Johnson."[90]

---

[82] Taylor Decl. ¶ 18 at 4.

[83] There is some discrepancy in the date Taylor says he resigned from the IAS Board of Directors. In Defendants' Opposition, it states he resigned in August 2012, Opposition ¶ 27 at 8, but in Taylor's Declaration, he says he resigned in April 2012. Taylor Decl. ¶ 18 at 4. The April date from the Declaration is used here because it is more consistent with the Payments Exhibit, which shows the last payment made to Taylor individually in 2012 was in April.

[84] Opposition ¶ 28 at 8; *see also* Taylor Decl. ¶ 19 at 4.

[85] Payment Exhibit.

[86] *Id*.

[87] Reply Memorandum in Support of Receiver's Motion for Summary Judgment ("Reply") at 18, docket no. 28, filed Jan. 24, 2022. The Receiver again asserts that Taylor did not provide reasonably equivalent value for the stock because "he sold the stock to give the proceeds to IAS to pay his wages," *id*. at 18, and this argument is addressed below.

[88] Reply at 18; Utah Code § 26-6-202(2)(b).

[89] Utah Code § 26-6-202(2)(c).

[90] Reply at 18.

- The Receivership Defendant IAS removed or concealed assets:[91] "By issuing shares to Taylor to be later sold under IAS's control, IAS removed and concealed assets."[92]

- Taylor's false statements in IAS's Form S-8 filed with the U.S. Securities and Exchange Commission in June 2005.[93]

These additional badges of fraud, if true, are certainly concerning. However, the Receiver again fails to identify the payments to which these badges should apply.

The Receiver has thus only alleged one badge of fraud, Taylor's insider status, that applies to all payments made to Taylor. For the other badges of fraud, the Receiver has yet to clearly delineate to which payments those badges apply.

Additionally, Defendants have raised a dispute of material fact as to whether all the payments to Taylor and Energizing Concepts were made in furtherance of, or were even related to, the solar panel scheme.[94] It does not appear to be disputed that Taylor performed other work for the Receivership Entities besides his work on the solar panel scheme.[95] Indeed, the Receiver alleges in the Complaint that Taylor "worked for IAS as an employee and as a manager of one of IAS's grocery stores."[96] The Receiver does argue that "[t]he work for which Taylor was paid wages and bonuses was central to the cover story Receivership Defendants created to perpetuate their fraudulent tax scheme,"[97] but the Receiver does not support this assertion with citations to evidence, and the statement does not clearly dispute that Taylor performed other work for the Receivership Entities which was unrelated to the solar panel scheme.

---

[91] Utah Code § 26-6-202(2)(g).

[92] Reply at 18.

[93] Form S-8, IAS, Exhibit M, docket no. 28-3, filed Jan. 24, 2022; Reply at 18. The Form S-8 states that IAS "will not receive any of the proceeds of sales of such securities." Form S-8 at 10.

[94] Opposition at 22; *see also* Declaration ¶ 3 at 1-3.

[95] Taylor Decl.; Reply at 2-4.

[96] Complaint ¶ 24 at 6.

[97] Reply at 17.

While transfers in exchange for work done to further the fraudulent solar panel scheme (especially post-2012 when the Receivership Entities were first threated with suit) were almost certainly fraudulent, considering the fraudulent nature of the scheme, transfers for other work Taylor performed for the Receivership Entities may not have been. On this record, there are still questions of material fact regarding whether individual transfers to Taylor and Energizing Concepts were fraudulent, and the Receiver has not distinguished or delineated between the individual transfers.[98] A reasonable factfinder could, based on the available evidence, find the Receiver had not established every transfer was fraudulent. Therefore, summary judgment is not appropriate.

**Taylor has raised a dispute of material fact about whether the Receivership Entities received reasonably equivalent value for his work**

Even if disputes of material fact did not exist concerning whether all transfers to Taylor were fraudulent, a reasonable jury could find that Taylor provided reasonably equivalent value in exchange for some of those transfers.

If the Receiver established the transfers were made to Taylor or Energizing Concepts with actual intent to hinder, delay, or defraud, the burden shifts to Taylor to show that the good faith defense applies because (1)  he took the transfers in good faith, for (2) reasonably equivalent value.[99] The Receiver does not address in his motion whether Defendants acted in good faith in receiving the transfers.[100] Therefore, for purposes of the Receiver's Motion for Summary Judgment, Defendants' good faith is presumed to be met. The relevant issue is then whether the Receivership Defendants received reasonably equivalent value.

---

[98] This includes the transfer of shares from IAS to Taylor. It is unclear from the Receiver's motion what the transfer of stocks was in exchange for.

[99] Utah Code Ann. § 25-6-304; Utah Code Ann. § 25-6-6(1) (2016).

[100] Receiver's Motion for Summary Judgment at 17 n.74.

Defendants' Opposition includes an affidavit by Taylor where he asserts he worked on other projects for IAS that did not include the solar panel scheme. Those projects included a self-scanning retail point of sale [system]," a "self-ordering restaurant system," a "cigarette vending machine," and a "DWM (Digital Wave Modulation) a propriety communication protocol . . . ."[101]

"[I]n determining whether reasonably equivalent value was given, the focus is on whether the *debtor received* reasonably equivalent value from the transfer."[102] "In other words, the question is not whether [the transferee] 'gave reasonably equivalent value; it is whether [the debtor] received reasonably equivalent value.'"[103] Taylor contends that IAS received reasonably equivalent value from those other projects he performed for IAS besides the solar panel scheme, such as the self-ordering restaurant system.[104]

The Receiver argues that because IAS stated in public documents that it had "not marketed any commercially acceptable products,"[105] IAS received no value for the work Taylor did.[106] But that argument is not persuasive. Merely because a company has not produced a commercially successful product does not mean that it has obtained no value from its engineers' work. A reasonable factfinder could conclude that the work Taylor provided in researching and developing products outside the fraudulent scheme was "reasonably equivalent value."

---

[101] Declaration ¶ 3 at 1-3.

[102] *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1276 (D. Utah 2015) (emphasis in original).

[103] *Klein v. Michelle Tuprin & Assocs., P.C.*, No. 214CV00302RJSPMW, 2016 WL 3661226, at *7 (D. Utah July 5, 2016) (quoting *Klein v. Cornelius*, No. 2:11-cv-01159-DAK, 2013 WL 6008304, at *3 (D. Utah Nov. 13, 2013)).

[104] Opposition at 22.

[105] IAS Annual Report for Fiscal Year Ended June 30, 2016 at 2.

[106] Reply at 2-3.

For the transfers that occurred in exchange for Defendants' furtherance of the solar panel scheme, it is likely that the Receiver would be able to establish as a matter of law that those transfers were fraudulent at trial. But based on this summary judgment record, it is impossible to tell which transfers were related to the scheme and which transfers were not. Therefore, because Defendants have raised a genuine dispute of material fact, the Receiver's Motion will be DENIED.

## ORDER

IT IS HEREBY ORDERED that the Receiver's Motion for Summary Judgment is DENIED.[107]

Signed February 25, 2022.

BY THE COURT:

David Nuffer
United States District Judge

---

[107] Docket no. 22, filed Nov. 9, 2021.